(No. 90-CC-1659—)

KINNEY CONTRACTORS, INC., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed November 19, 1997.*

CALANDRINO, LOGAN & LAMARCA (MICHAEL J. LOGAN, of counsel), for Claimant.

JAMES E. RYAN, Attorney General (VERNE E. DENTINO, Assistant Attorney General, of counsel), for Respondent.

## OPINION

EPSTEIN, J.

This is a contractor's three-piece claim for $17,710.99 of additional compensation for FY1988 road-patching work under a competitively-bid contract with the Department of Transportation ("IDOT"). This 1990 claim over a 1988 dispute was tried to our Commissioner in 1991 and is finally before the full court on the pleadings, the trial record and the Commissioner's extraordinarily delayed 1997 report.

### The Contract

Claimant, Kinney Contractors, Inc. ("Kinney"), brought this claim seeking additional compensation on three payment components of IDOT contract no. 42938 for FY88

road-patching work in IDOT District No. 2 (Boone, Carroll, JoDavies, Stephenson, and Winnebago counties). The contract was awarded to Kinney, as low bidder, in December 1987.

Under the contract, the Claimant was to, and did, perform road-patching work in District No. 2. Under this type of contract, the exact quantity and location of work to be done, as well as the ultimate compensation, is unknown at the time of bidding and contracting. The actual work is designated in work orders later issued by IDOT to the contractor. The contractor's compensation is determined by various unit costs and work charges specified in the contract.

Claimant's final billing for the contract period was $192,387.79; IDOT approved and paid $174,676.80 under the contract. Kinney's $17,710.99 claim is for the difference. IDOT disputes Kinney's entitlement to any additional compensation under this contract.

### The Claims

Claimant's $17,710.99 claim has three distinct and independent components:

(1) Charges for "call-outs," for which Claimant seeks an additional $4,500.

This claim turns on the interpretation of the contract definition, for payment purposes, of the term "call-out" and its application to the work performed by Kinney. This term, undisputedly, affects or determines the number of compensable "call-outs" under the contract.

(2) Charges for "non-lateral" movement of traffic control devices, for which Claimant seeks an additional $1,537.61.

This claim turns on the interpretation of the contract language defining a "location" of traffic control. This term is claimed to affect or determine the number of compensable traffic control "locations" and hence the total charges for "non-lateral" (i.e., longitudinal, referring to the roadway directions) movements of traffic control devices between locations.

(3) Charges for traffic control devices ("markers"), for which Claimant seeks an additional $11,673.38.

This claim is based on the interpretation of the "length" aspect of "traffic control areas" prescribed in the "2316-10" diagram in the contract specifications. This length specification, as applied, is claimed to affect the quantity of traffic control devices required and compensable, and hence the total charges for such devices.

## The Trial

Trial of this claim was held on May 2, 1991, before Commissioner Stephen R. Clark. The documentary evidence included the contract, the billing, work order, IDOT regulations and IDOT's departmental report. Two witnesses testified: James R. Kinney, the president of the Claimant, and Darryl Stiemstra, then the district construction engineer for IDOT.

## Analysis

The three contract construction issues in this case arise out of IDOT's general specifications ("Standard Specifications for Road and Bridge Construction," sometimes called the "Red Book") or IDOT's "Supplemental Specifications and Recurring Special Provisions." Both are part of contract no. 42938 by incorporation. The Red Book and various selected supplemental/recurring provisions are incorporated into most IDOT road contracts.

There is no dispute as to the applicability of the contract provisions in issue or as to any facts. IDOT does not dispute the quantity, quality or contract-conformance of Kinney's work. The issues are purely matters of contract interpretation and application.

A. The "Call-Out" Issue

Claimant was paid $1,500 for one "call-out" under this contract, based on the single IDOT work order that was issued (Respondent's Exhibit No. 3), which covered three routes in and around Rockford, in Winnebago County. IDOT maintains that that work order constituted one "call-out" under the contract. Claimant contends that the work order constituted three "call-outs," because it included three routes. Claimant also contends that a separate work order addendum that extended its patching work on U.S. Route 20 resulted in an additional "call-out" under the contract, bringing to three the number of claimed, but unpaid, "call-outs." Claimant's position is based on the interpretation that a "call-out" is limited to a single county and to a single route.

The contract definition of "call-out" is contained in the special/recurring provisions of the contract (special provisions, sheet 3), and provides as follows:

"*CALL-OUT*: This work shall consist of the preparation and operations necessary for the movement of personnel, equipment, supplies and incidentals for each call-out to the job site designated by the Engineer.

A work order will not be sent unless a minimum of 48 square yards of patching has been located; ***.

Basis of Payment: This work will be paid for at the contract unit price each for each CALL-OUT as described above * * *."

Claimant contends that this provision is ambiguous, and that therefore parol evidence of the parties' intent and extrinsic evidence of IDOT's course of dealing on this recurring contract term are admissible with respect to its interpretation. Relying on the apparent facial circularity

of this "definition," the Commissioner agreed and allowed parol evidence.

Having opened the door to extrinsic evidence, Claimant advanced its "one-county, one-route" interpretation of "call-out." Claimant's interpretation would impose geographical limits on this facially-unbounded term through extrinsic evidence. To this end, Claimant presented testimony: (i) of Mr. Kinney's understanding of this term at the bidding time, fortified by the work order example contained in the bid documents (which was for a single route in a single county), (ii) of IDOT's payment to Kinney under another contract for two "call-outs" on one work order that had directed work on one route in two counties, and (iii) that in performing the work, Kinney was required to move equipment on separate routes up to ten miles.

IDOT countered with evidence of billings and payments for "call-out" on other contracts; testimony of the purpose and of IDOT's application of this provision; and testimony as to the purpose and application of another recurring provision, also contained in this contract, for "mobilizations." The "mobilization" provision compensates the contractor $500 for each movement of its equipment between job sites.

Although we are disinclined to reverse the Commissioner's allowance of parol evidence in the absence of objection from a party, which is missing here, we must comment on the "ambiguity" issue and on the nature of the Claimant's extrinsic interpretation argument, as we are not fully convinced that there was adequate justification for the parol evidence in this case, although the point is harmless in light of our ultimate conclusion.

Some things are clear about this "definition" in IDOT's special provisions: (1) it is strikingly inartful; (2) it

is facially circular (in that it defines the term in terms of the same term); (3) because it is circular, it is not an objective definition of "call-out"; and (4) its language in no way supports or suggests either the "route" or "county" limitations urged by this Claimant. Indeed, the contract text does not support any physical limitations on "call-outs" other than those that may be embodied in the term "job site" which is an element of this definition.

However, we are unconvinced that this provision is ambiguous in the classic sense, or that it is ambiguous in any way that might help Claimant's argument. We are also unconvinced that this "definition" cannot function sufficiently clearly to accomplish its contractual purpose notwithstanding its lack of objectivity or of quantitative specificity.

Ambiguity denotes a multiplicity of meanings that are each fairly conveyed by the text. That is classic linguistic ambiguity, in which competing meanings emanate from the words and phrases and sentence structure employed. The competition between multiple meanings, when unresolved by the rules of language or the canons of construction, may be resolved by resort to extrinsic evidence in an effort to glean the drafter's actual or constructive intent.

This "call-out" definition does not present competing meanings: none are identified by the parties. However, Claimant's contention is not so much that this definition is classically ambiguous, as that it is vague and indefinite. Claimant really objects that this definition is unbounded. This court does not accept the proposition that an absence of quantitative limits *per se* is vagueness that opens the door to parol evidence, although it surely is sometimes.

We would strike the extrinsic evidence in this case if the law were that only a classic ambiguity supports admission of parol evidence on a disputed contract term. But the law is somewhat broader than that. For purposes of opening the door to extrinsic evidence on a contract term, "ambiguity" encompasses severe vagueness as well as classic ambiguity:

"The existence of ambiguity in a contract is a question of law for the court. (*Joseph v. Lake Michigan Mortgage Co.* (1982), 106 Ill. App. 3d 988, 62 Ill. Dec. 637, 436 N.E.2d 663.) An ambiguous contract is one capable of being understood in more than one sense [citation omitted] *or an agreement obscure in meaning through indefiniteness of expression* or having a double meaning." *Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 47 Ill. Dec. 36, 414 N.E.2d 1152; *Mid-City Industrial Supply Co. v. Horwitz* (1st Dist. 1985), 132 Ill. App. 3d 476, 87 Ill. Dec. 279, 476 N.E.2d 1271 (emph. added); *see also*, 17A Am. Jur. 2d, *Contracts* section 403 (1991).

Thus, parol evidence admissible on the basis of "vagueness" or "indefiniteness" can open the door to an interpretation that does *not* emanate from the words and phrases employed in the contract, as this Claimant seeks to do here. We conclude that there is a basis—albeit a barely adequate one—for parol evidence in this case in the absence of objection by a party.

However, this court is skeptical of extrinsic meanings brought—by either side—to a contract whose text does not suggest such meaning. In this case, the Claimant seeks to evidence an interpretation that would impose two geographical limitations on a contract "definition" that are nowhere contained nor suggested by the words of the contract.

Having considered the parties' parol evidence, the Court is utterly unconvinced that the Claimant's "one-county" or "one-route" limitations can, or should, be engrafted onto this contract definition. We also conclude that this provision is not as unclear as it first appears on its face.

Claimant's evidence of past IDOT practice is inadequate. Claimant's meager evidence of prior billings and payments is ambiguous at best and does not reflect "county" and "route" limitations. Claimant's evidence is far short of a consistent usage that might persuade this Court to adopt an extrinsic meaning that is textually unsupported. Claimant's evidence simply does not support its argument.

Moreover, review of this definition in its contractual context shows that it is workable. The function of this provision in this contract, undisputedly, is to establish the basis for applying the contract's $1,500 payment rate for "call-outs." This, we find, it does.

The contract states that this payment is for "the preparation and operations necessary for the movement of personnel, equipment, supplies and incidentals *for each call-out to the job site designated by the Engineer.*" (Emphasis added.) Although there is an element of circularity in this phraseology, it is clear enough that the ultimate determinant of a call-out—and the key operative phrase relative to any geographical or distance factors—is the "job site." The job site, in turn, is contractually specified to be the site "designated by the Engineer." Thus, in the absence of any further contract definition of "job site"—and in the absence of any contractual limitations on the [IDOT] engineer's designation of "job sites"— none of which are identified in this contract by either of the parties, this provision says only that a call-out for payment purposes is the engineer's call-out to whatever job site he or she designates.

It is immaterial that this provision does not qualify as an artful or as an objective "definition." It is clear enough to function as a specification of the work that is to be compensated as a "call-out" at $1,500 per call-out. Claimant's complaint was more appropriately aimed at the engineer

who wrote the work order, rather than at this Court, which lacks a contractual basis for second-guessing the job site under that work order.

Finally, we note the presence in the contract of a different payment provision for moving equipment *between* job sites: "mobilization," which are compensated at a $500 contract rate for each such movement. This separate contract provision clearly disposes of Claimant's contention as to the extension of the Route 20 work order.

For these reasons, we find no contractual basis for this "call-out" claim, and reject this first component of this claim for $4,500 of additional compensation.

B. The "Non-Lateral Movement" Issue

The second component of the Claimant's contract claim is for additional "installation" charges that are compensable for each separate "set-up" or "installation" of a work area in a "new location" under article 109.04 of the contract. The narrow contract construction dispute presented here focuses on the difference between "lateral" and "longitudinal" movements of the work area, both of which require movement of the protective "traffic control devices" but only one of which is separately compensable under the contract.

The material provisions of section 648.05 of the Red Book read as follows:

"b) Traffic control and protection required under Standards 2309, 2310, 2317 and 2318 will be measured at each location specified on an each basis. Standard 2316 will be paid for on an each basis when the traffic control and protection applies to isolated stationary work areas and does not involve or is a part of other protected areas.

Where the contract work to be performed requires longitudinal movement of the work area, each installation of a Standard in a new location will be paid for in accordance with Article 109.04. A contiguous lateral movement of the work area causing a change in the location of traffic control devices, but not a longitudinal relocation of the work area, will not be considered a new installation."

Claimant argues for a strict application of "lateral movement" so as "not [to] encompass any longitudinal movements" (Claimant's Brief, at 6) so that "the moving of barricades for lane change, unless straight across from the original repair, should be an additional expense item." (*id.*, at 7) On that strict construction, supported by the principal of construing [ambiguous] contracts against the drafter [here IDOT], Claimant urges that Mr. Kinney's testimony that "the required movement of traffic control devices was to some extent longitudinal and not purely lateral," (*ibid.*) requires additional compensation for non-lateral traffic control set-up charges.

We disagree in two respects. First, Claimant's proffered construction is not merely strict. Claimant's construction is "pure," as it concedes, and is so pure as to exceed the bounds of reasonableness as well as the Ivory Snow test [99 44/100]. We need not here explore the academic distinctions between truly lateral and truly longitudinal movements of road "work areas," but we observe that the contract's "non-lateral" standard must be read in light of its explicit purpose, which is to distinguish genuine "relocation[s] of the work area" that are compensable, from non-compensable lateral movements on the same stretch of road. In that context, we find no basis for a "pure" non-longitudinal standard for "new locations."

Second, we find the Claimant's evidence on this claim inadequate to support an award, much less to convince us to make an award, on any view of the standard. Simply put, the Claimant did not produce competent quantitative evidence of longitudinal movements of work areas under this contract that could warrant additional compensation.

For these reasons, we reject this second component of this claim.

## C. The Traffic Control Markers Issue

The third and final component of the Claimant's contract claim is for $11,673.38 of additional charges for supply and use of traffic control markers. Claimant's basis is the "2316-10" diagram in the contract specifications. This diagram, entitled "Typical Application of Traffic Control Devices—Highway Construction and Contract Maintenance," is a general IDOT directive on how and where to set up traffic control devices. As explained by IDOT's engineer at trial, and undisputed by Claimant, this diagram is applicable generally, if not universally, to several kinds of highway projects, including road patching and road repair.

Kinney contends that the diagram establishes the maximum length of a work area, and thus, that additional compensation is owed for the additional markers required for those work sites that exceeded the 2316-10 specifications under the subject contract, i.e., the excess markers. We must reject this claim for three reasons.

First, we do not find any maximum length of work areas or work sites specified in the 2316-10 document, and we do not find the diagram at all ambiguous in this omission (as Claimant erroneously contends, thereby seeking to invoke construction against IDOT as drafter). The diagram is a placement specification, is plainly intended to cover work areas of varying lengths, and does not purport to define or limit the work area length at all, but only to specify the placement and density of traffic control devices within, and adjacent to, the actual work area. The scale-break markings on the diagram are standard drawing protocol, and affirmatively show that the work-area lengths are *not* to scale. Claimant's interpretation of the diagram is baseless.

Second, there is an inadequate evidentiary basis in this record for this Court to award damages for additional

work areas or for additional markers. The sole basis identified by Claimant is a letter, which is argumentative and perhaps sufficient as a pleading, but far short of the mark as competent quantitative evidence. There is no evidence of additional set-ups at all.

Third, we are unpersuaded that there is an applicable compensation element or specific provision of this contract that applies to this issue. Claimant has not specifically pointed to one, except for the set-up charges, which are blatantly inapplicable to "additional markers" required for a hypothetically overlong work area. In the context of this "as-needed" repair contract, which the Court has reviewed extensively, we remain unconvinced that this third sub-claim presents a genuine claim for a separately compensable item under this contract.

### Conclusion and Order

For the reasons set forth above, this claim is denied in its entirety. Judgment is entered for the Respondent and against the Claimant.